Please be seated. Mr. Compton. May it please the court. My name is Nicholas Compton. I'm an assistant federal public defender in the Northern District of West Virginia at Martinsburg and I represent the appellant in this case Jonathan Lee Wienke. I have reserved your honors seven minutes to rebut. Your honors, this case arises out of the improper search of Mr. Wienke's residence in Martinsburg, West Virginia on June... Counsel, you know to start with the optics of this are a little difficult to get past because as I understand it, your client as an employee of the Department of Homeland Security is a technician of some sort, has no law enforcement authority, no authority to carry a weapon, and his workstation is in very close proximity to where the past officials of the Department of Homeland Security meet. Yet he shows up for work that day with a loaded pistol, a knife, pepper spray, an infrared camera, handcuffs, and the handheld radio. So on the surface it would seem to me that the only unreasonable thing to do would not to have been to get a search warrant for his house. I understand the court's reasoning on that. I think there is a plausible explanation as to why Mr. Wienke had those items on him, and I don't think that the conclusion without more, which is our issue here, that the possession of those items automatically meant an attempt to, as the special agent man put it in the Warren affidavit, assassinate, kidnap high-level officials of the Department of Homeland Security. They don't have to automatically indicate it, they don't have to indicate it with certainty. What Judge Ages laid out to you is you got incredible, someone who would seek to pass through a security place, he works in there, and he gets by, somehow they don't detect this gun on him. I guess it's a small gun. It's very tiny, Your Honor, about the size of a credit card. But anyway, the point Judge Ages is making is that when you put that together, why is that just not sufficient, given the fact that right across from his office is this high-level meeting, the sensitivity of where he is, and he has all this on him. There's nothing in the warrant affidavit, Your Honor, to indicate other than the officers, what he describes as his training and experience, to indicate that Mr. Wynke had any items in his residence, a hundred miles away in Martinsburg, West Virginia, to indicate that he was conspiring with others, which is what the warrant affidavit says, to kidnap or assassinate high-level members of the Department of Homeland Security, or impersonate a police officer. Well, let me... I understand that you are primarily concerned about the strength of the evidence linking what Mr. Wynke turns up with at work, and the warrant to search his house. The difficulty that I have there is that he has in his possession two handheld radio communication devices. Yes, ma'am. He probably wouldn't need them to communicate with people in the building. So why would it not be inferable? And the only reason these, which I find really disturbing, the only reason these items were detected is that he was selected for random screening, so apparently he could have entered the building with all this impedimenta. Why would it not be a rational or reasonably, reasonable inference that he was going to communicate with this communications device? I think it is an inference that he would communicate with it, but to communicate with it for the purposes of kidnapping or assassinating or impersonating a law enforcement officer, I think is the issue. Mr. Wynke, and I think the case law indicates this, that the facts, it's a very fact-specific analysis that has to be done. Mr. Wynke took public transportation all the way from Martinsburg, West Virginia, to his office on Nebraska Avenue in Washington, D.C. And so what that required of him was to get on the MARC train in Martinsburg, head to Union Station in Washington, D.C., and then get on a Metro train from Union Station to the Nebraska Avenue address. In the months and years leading up to, Mr. Wynke had been working at the Nebraska Avenue, or at least for DHS, for six years. In the months leading up to that, there had been multiple accidents on the Metro train involving trains getting stuck in the tunnel, individuals dying because the smoke was coming in through the tunnels and they couldn't get out. There had been shootings. Where was Wynke going with this? Well, what I was suggesting to Your Honor was that he took, he had those items on him because he was a commuter. And the bottom line is Mr. Wynke is the type of person who likes to prepare for those type of eventualities. He is not the type of person that... What type of eventualities? For instance, a Metro train breaking down in the middle of a tunnel that would require him to... And that requires a knife, a loaded handgun, pepper spray, an infrared camera, and handcuffs? Infrared camera to see through the smoke in order to get yourself out of the tunnel. Two-way communication if you need to talk to somebody, you know, give it to another passenger in order to get through the tunnel so that you all can get out of there. If he is attacked, then handcuffs to assist him. He was a legal firearms holder in the state of West Virginia. Even if we could plausibly agree that he could possibly have intended to, how do you get around he goes through the security, then they come up and question him, they ask him, do you have a weapon on you? He says no. He forgot. He forgot. But he didn't forget it on the train. No. You said he needed it on a train, he knew he had it. He had the items in the backpack that was sort of like a go bag. A gun loaded with five hollow bullets in it. He forgets, and where is he? Your Honor, it's the size of a credit card. What building is he in? He's at the Department of Homeland Security headquarters. Right across the hall is a high-level meeting taking place and he forgot? That he did not know about. He did not know that that meeting was taking place that day at that time. The gun is the size of a credit card. This is the question. To what extent you got these possibilities? Maybe he did forget, you can credit one way. There's a line of cases in the Fourth Circuit that basically go to, you are entitled to draw logical conclusions that will lead you to believe that items of whatever is going on here can be stored somewhere else. There's a line of cases, and the only cases that seem like to me, the Lawler case may go the other way to some extent, but they're drug cases. And it seems to me to be materially different, or is it from your perspective, when the allegation is a terrorist type opportunity or something like this can happen, as opposed to maybe he's got drugs somewhere, a hundred miles away? I don't think it's materially different, Your Honor. I still think they need to make the nexus connection between the house and the activity that occurred. Think about the imminent danger and what arises from that if they do nothing. And he actually does have it there. And this two-way radio that Judge Duncan mentioned is a fact that indicates there's somebody else. You don't have a two-way radio to talk to yourself. There's someone else that's connected with this. So think about that in terms of the, I mean, I don't know if there's been a case on point to deal with this kind of factual situation, but this isn't just about dealing with policy or good idea. You have officers, and by the way, one big difference on those cases in this case is what you just mentioned. That officer says he was trained and he had experience in this and he understood it. Courts give deference to that level of testimony when establishing this. Yes, Your Honor. So two things. First, I can imagine, I think, the horrible possibility of what could potentially happen in a terrorist attack. But I don't think that because of the terrorism aspect of it, that that takes away the sanctity that is associated with somebody's home. To just say that, well, because this involves terrorism and not drugs, or potential terrorism and not a murder case. We have, you do recognize that there is a fair amount of case law that allows us to rely on the experience of a trained officer in a certain area as support for probable cause. Because there was a warrant. There was a warrant, Your Honor. I don't believe, though, that that case law says that the only thing that the magistrate can rely on is the officer's training and experience. And I think that's what we have here. Well, couldn't the officer look at the nature of the items and the fact that they certainly had a communications component to them? Whom was he likely to handcuff within the department? I don't know that he was intending or was likely to handcuff anybody in the department. None of us know. So the point is what reasonable inferences can be drawn. I think reasonable inferences can be drawn if the officer had any additional information other than just what he had on him. If he had interviewed or talked to a witness that was there that said this guy was making threats or he had postings before about activity. I had seen him detain somebody with those handcuffs before acting like he was a law enforcement officer when he wasn't. Some other corroboration. We have never held that there has to be additional corroboration other than information that is known about the individual. Even in monetary crimes, we have relied on the fact that accountants often use home offices as basis for probable cause to search their home computers in IRS fraud cases, for example. And this seems to me to be quite a step beyond that. I think, Your Honor, that the cases that we have cited, I know, for instance, in the Lawler case in law, I think it was as well. The officers always had some other component. I recognize that many of those were drug cases. There was always some other component besides just the officer saying, based on my training and experience. And what I'm suggesting to you is that there clearly was here in the nature of what they had, what he had in his possession. Surely, is it that you don't think that's corroborative at all? I don't think that the mere fact that he had those items on him without something else. You're trying to corroborate. You're trying to cabin them. You see, you're saying, well, there has to be something more than the officer's belief, even given his training. There has to be something more. So, I point to something more. I point to the items in his knapsack. Well, there has to be something more. There is a pretty, it seems to me, at least arguably compelling totality here in what there was. I think if we analyze it or analogize, excuse me, to, for instance, the drug cases. I don't think a warrant would issue if an officer found on a potential defendant a quantity of substance. And then solely based on the fact that he says, I found this quantity of the substance, and based on my training experience and the fact that he had crack cocaine on him, I think I can now go and search his house and then subsequently search his car and his shed and all of these other things. Here we have a gun and other potentially offensive weapons. And we have lots of cases that treat guns differently, particularly in terms of the nexus to the defendant's house where it would logically be concluded that they kept other weapons. But he had one weapon on him. No, he had a knife as well. A knife is a weapon. Yes, ma'am. He had a pocket knife. That was seized, and he was allowed to go to his back to his workstation. No, I was just responding to your characterization. Yes, ma'am. And that is correct. And pepper spray. The only reason it was seized is because he was, it wasn't like through the routine, but he sort of specially pulled aside for this search? Yes, sir, he was, but it was, he wasn't specially pulled aside because they noticed something about him. It was like a random thing. It was a random, it was a random search. So had they not randomly picked him, he'd walked on in with it. He probably would have walked on in, but he'd been working there for six years, and I don't know, but I could probably guess, and I think we could surmise that he may have. Did he know he had that on him? I think he did know that he had on him as a pocket knife. But he didn't know about the gun? The gun was the size of a credit card, and he was wearing cargo pants where the gun was at. The gun was in a cargo pants-type pocket. He had worn those pants apparently the night before, and because he has to get up at about, he has to get up about 3.30 to make the 4.30 train into D.C., he apparently just pulled on the pants that he had without going through. He is, with no criminal history, a legal concealed carry individual in the state of West Virginia. And so he had it in his cargo pants at the time and did not realize, given the small size of it, that it was still on him. And I think, again, when, and this we didn't really find issue with, but when he curses, it's more of a, oh, I forgot that this was in there, I can't believe that, versus the officer interpreting that as, oh, you caught me, sort of thing. I'm three minutes over. Thank you very much. You did reserve seven minutes for rebuttal. Yes, ma'am. Thank you. Ms. Krasinski? May it please the Court, my name is Anna Krasinski and I represent the United States in this matter. Could you speak into the mic a little?  Thank you. The Williams case set forth the principle that probable cause to search a suspect's home exists when there are two facts. First, facts supporting the inference that the suspect is involved in criminal activity, in that case drug distribution. And second, the reasonable suspicion that evidence of that crime will be found in the suspect's home. And the Williams case indicates that that reasonable suspicion can be set forth in two different ways. First, an explicit statement based on the training and experience of the law enforcement officer. Or second, based on the common sense reasonable inferences of where that type of evidence is likely to be found. What about the Laylar case? The Laylar case dealt with whether or not the Leon good faith exception applies. In that case, a drug distribution case, the affidavit did not contain any facts linking the drug distribution to the defendant's residence. And the Court explicitly stated that the affidavit also did not contain a statement by the affiant. The Court says it did not establish a sufficient nexus between the drug dealing and the residence of the home for which it was searched. That's correct, Your Honor. And one of the reasons that it said that was because the affidavit lacked a statement by the officer that in the officer's training and experience, that type of evidence would be found in the home. I think when I read Laylar, I infer from that that had that affidavit had that additional statement in it, as the affidavit here did, that the officer is trained in this type of thing and based on his training and experience, evidence of drug distribution is found in the defendant's residence, I think the Court in Laylar would have found that the affidavit was sufficient there. Regardless, the Laylar case court found that even though that was missing from the affidavit, the Leon good faith exception applied because the officer did everything right. Sought a search warrant. The search warrant was then approved by two independent judges, the magistrate judge who signed off on the warrant and then a district judge in looking at the motion to suppress. So in addition to the fact that I think the Laylar court would have found probable cause had there been the additional statement that there is in this affidavit, I think that case also supports that if this court doesn't find probable cause and sufficient nexus in this warrant, that the good faith exception would apply here given everything the officers did. There's evidence here that established that probable cause would exist based upon what they have obtained to be able to search his home 100 miles away. What's that key evidence in this case? Well, first, the affidavit established that he lived at this home in Martinsburg, West Virginia, and that he was working in D.C. It's reasonable to infer from that that you commute from your home to your job. That's not enough. That's one piece. I agree, Your Honor. So far, that's nothing. So give me something that is evidence to show the nexus. I mean, the fact he lived there and worked there is not enough to go to his home. So go to the evidence here tells me we can go to his home and search it. Based on all of the items he had altogether, the loaded firearm, the handcuffs, the walkie-talkie. Handcuffs are enough? I don't think one piece. If he didn't have the handcuffs, would you still have it? I think it's the totality of the circumstances. I want to know. If he didn't have the handcuffs here, would that be enough? Yes, Your Honor. I think the walkie-talkies are one of the key pieces of evidence here, and that's because it indicates that he's working with someone else. And the officer states that based on his training and experience, when someone's planning something like this with someone else, that evidence of that is going to be in their home. Evidence of planning, evidence of preparation, and evidence of the identity. So the walkie-talkie is definitely – that's coming across. The fact that he's communicating, in his experience, he would communicate. But if that's all he has, that's not going to be enough. No, Your Honor. I think if we parse out every single piece of evidence. We're not parsing out. We're building the evidence of what's necessary. What is the evidence that makes this nexus here? We're not parsing it out. We're not looking at each individual piece. I want to know collectively what it is that gives the nexus here. And we know it's not the fact that he lives there and he works here. We know it's not just that he has handcuffs. What is it that makes this – give me the picture. It's the fact that he attempted to and succeeded in taking at least the loaded firearm into this highly secure facility where he has access to 3,000 federal employees, including the secretary and the deputy secretary. Is that fact alone sufficient? I think that the fact that he attempted to take all of these items in, including the walkie-talkie, yes. My question, with that fact alone, he walked in with a loaded firearm with five hollow bullets in it, across from that meeting, is that sufficient? No, I think the firearm and the walkie-talkies together with the officer's training and experience in these types of investigations, Your Honor, I think that's the minimum that we need here. I'm anticipating the next case. See where you're going with this. But I think what we have here and what we need to have to establish the nexus is the fact that the officer says, when you're planning this type of violence with someone else, you plan it in your home. Evidence of the planning, evidence of the preparation, evidence of who it is you're planning it with, that's all in your home. So with the gun, particularly that it's loaded with hollow point bullets, with the walkie-talkies, and with everything else, the common sense inference is that he is planning to use them. What about being 100 miles away? I mean, isn't distance something sort of important in that line of cases that support the defendants, at least Lawler and others, that the home, if the home was in D.C. or where it was, clearly or, you know, it sort of seems obvious. He's 100 miles away. Give me a case that connects this with a 100-mile away home. I don't have a case that talks about the distance, Your Honor. I think the important – Or is the fact that it's his principal residence sufficient in and of itself? I think the fact that it's his principal residence, in addition to the fact that you go from your principal residence to work. I think you need those two facts here, which we have, or at least can reasonably infer. So if he was staying with his aunt there, that's not enough. It's the fact it's his principal residence. If he's there for a weekend or whatever and he's going back, you can't go search that home. I'm trying to understand it. The cases seem to indicate there has to be some proximity, which makes sense. I mean, if you jump from downtown and you go into this office, there's probably something going on here. But 100 miles away, I want to make sure, you know, are we talking about because in this day and age you can jump on airplanes and go a long ways away. You can be 1,000 miles away. And if you find these items here, can you search that home 1,000 miles away? Is that connection established? In other words, does distance matter? I think in this particular case, distance does not matter. Because? Because it's his principal residence and he's commuting from his home. Why then did you make the point that he's 100 miles away? I didn't quite understand how you thought that cut, to be honest. I don't understand how it cuts, which may be part of Judge Wynn. I don't understand what it connotes in the analysis. Yeah, that's where I'm going with it. And you say it's different because it's his principal residence. And what I'm saying is 100 miles. Principal residence could be downtown. It could be 100 miles away. And what's different about a principal residence as opposed to where he just stayed? Because I think. He might have a principal residence in California, but he's, you know, sort of TAD here, whatever, and he's sort of living here in these quarters. Can you search those based upon this information? 100 miles away. Well, the affidavit explicitly states that this is where he lives. And so because it's his residence and the officer, based on his training and experience, knows that that's where people plan this type of crime and that's where evidence is. That's the key here. So it's not the distance. I'm trying to write it the way you want to write, but I'm trying to understand. You are saying as long as it's just his principal residence, no matter where on planet earth it's located, you can search it based upon this information. And the only key difference is principal residence, which does not apply to any other type of residence or living conditions. I think in this case, based on these facts, I don't think it's a universally applicable rule. But all you've given me is principal residence. This case could be any case, principal residence. What is it in this case? Is it the nature of the offense? Is it the allegation? This case, what are you talking about? It's the nature of the offense. The nature of... Pass it out for me. Tell me what you mean. If he's planning to kill or attempt to kill a federal employee, he could be looking up maps of the facility. He could be doing research on his potential target, trying to figure out their schedules, trying to figure out when they're going to be... So do we limit this to this kind of fact-specific situation where we're dealing with, I guess, a terrorist-type plan against, I guess, anybody? It shouldn't just be federal employees, should it? No, it's the federal aspect that gives us jurisdiction. Are we limiting... Can we write that to limit it to deal with this type of case and maybe distinguish it, not drug case or something like that, or what? Well... Is it an imminent possibility of a danger? I think the analysis actually corresponds with the existing cases, Anderson, Johnson, Grossman, Severance, that what you look at are the normal inferences of where someone would keep and store that type of evidence. So I think it fits with that. Here, the normal inference, if someone is planning an attack against a federal official, against the deputy or secretary of the Homeland Security, that you're doing that in the privacy of your own home, that you're doing that in a place where it can be private, that you can sit and you can do the research you need and you can plan. Why wouldn't we have some sort of determination that, well, you have to determine, is this a person? Is there a possibility of a base that the person would be in? Are there facts that would establish this is the more probable place that it would be? Whether it was home, a garage, workplace, wherever, if he's there most of the time and all of his implements and stuff is there, I mean, why would we limit it just to the primary residence? Because all this is going to do is say, you write something like this, then smart criminals will not keep stuff in their primary residence. And then the next case comes and says, we didn't have it in residence. That case says it has to be the primary residence, and it was down in my garage where I work. And they've got to search warrant for that. It doesn't need to be limited to the primary residence, but the analysis here based on this affidavit is a fact-specific analysis. And the facts of the case here were that the law enforcement officers were aware of this primary residence. I don't think if the court were to rule in my favor and write this that it would need to limit it based on principal residence as a general matter, but based on the facts in this case and based on the affiance statement based on his training and experience that people keep in store and maintain this type of evidence in their home. That's what gets us to his primary residence in this case. My concern is a little different but related. I've seen a number of these situations where an officer applies for a search warrant for the home based on a set of facts indicating criminal activity. This seems to me rather remarkable in the amount of evidence we have to look at that indicate the two-way communications capacity in particular suggests the availability or the need to have the communications available for the person who's still at large. But in some of the other cases, are we getting to the point that we would automatically assume that a criminal would plan at home, that a criminal would keep incriminating evidence at home? So it's always appropriate to get a search warrant for the home? Excuse me. What would you say to allay that concern? I don't think it's always appropriate to search a home. For example, if we look at drug investigations, it's common in a drug investigation for law enforcement officers to develop evidence that someone is Again, I think it's a very fact-specific inquiry. If those were the facts developed in an investigation, I think your warrant would be applying for the stash house and not the residence. So I think the case law limits that already in the fact that it has to be related in common sense terms to your evidence and facts at hand. So no, I don't think that there's the general proposition that anyone who's involved in criminal activity, that you can search their home. I do think it has to be a fact-specific driven inquiry based on the investigation. Does the nature of the defense make a difference? The nature of what is being charged, does that make a difference? Yes, Your Honor. In the cases that I've looked at, the court does seem to look at the nature of the offense, and I think the nature of the offense is a factor here. So for example, in the Anderson case, when the court found that it is reasonable to believe that someone keeps a gun and silencers in their home, they were looking at the nature of the offense. So I do think the nature of the offense plays a role in the analysis, as well as the type of evidence that you're seeking to find. Thank you. Did you have anything further? In the event that the court does not find probable cause in this warrant, we should have done. He came, he got a warrant, he executed that warrant. When he found additional items and found places that he didn't apply for in that warrant, he sought additional warrants, and so the lee on good faith would save any deficiencies in this application. Thank you. Was there any other evidence other than the fact that the defendant had traveled directly from his primary residence 100 miles and come to work? No, Your Honor. It all indicates there was a direct line between his possession of these things from there to there, nothing showing otherwise? Correct, Your Honor. Okay. Thank you. Thank you. Mr. Compton, you have reserved some time for rebuttal. And one of the things I forgot to ask before I would like you to address, I neglected to ask you about the good faith exception. I know in your brief that you, your argument seemed to be that this was just such a bare bones affidavit that it was undeserving of deference, but I wanted you to go into that for me. Yes, ma'am. As the court knows, the four situations where the officer's reliance on the search under Leon would warrant that it was not reasonable. The first deals with whether or not the warrant was based on an affidavit that contains knowing or a reckless falsity. We had concerns there within that element because the officer had indicated that he knew, that Mr. Wynke knew, that there was a meeting of high-level individuals taking place that day in a room directly across from where his cubicle was. During the argument at the district court level, the government had indicated that there was no documentary evidence, there's no indication in the affidavit that the officer obtained any documentation about scheduling. There's no indication in the affidavit that the officer, Special Agent Mann, interviewed anyone or obtained any witnesses or like a supervisor that would say Wynke had access to the scheduling and the information of the secretary. In fact, Mr. Wynke did not know that a meeting was taking place, yet the officer says in a blanket and what we, I believe, consider to be a reckless fashion, say that I know that he knew. Could he not look outside his cubicle and make that determination? Wasn't that a fairly easy thing to ascertain? It would, ma'am, but that would, Your Honor, that would require that he would have to have brought all of these items in order to do what the officer said, kidnap or kill the secretary. He would have to have brought these items in the anticipation that the secretary was going to be in a location. Well, I'm only responding to your suggestion that the officer was lying or misrepresenting when the officer said Wynke knew. I think that I wouldn't go so far as to say he was intentionally lying. I think it was a misrepresentation. And that section allows for reckless statements to be considered. I don't think that the officer had any way of knowing, and he certainly didn't indicate it. Why wouldn't it have been a reasonable inference, though? I mean, he could stand there, he finds Mr. Wynke with the gun and all the other stuff, and then he turns the other direction and sees where all these folks are going to meet. Well, for purposes of getting a warrant, why wouldn't that have been a reasonable inference? Well, I think you would have to infer, Your Honor, that the defendant brought all of these items, including the gun, on the off chance that the Secretary of Homeland Security would be directly across from him in a meeting with other high-level folks. Maybe that was his lucky day. We don't know that he didn't come similarly prepared. We don't know that he didn't do that before. That's true, that he didn't bring these items before. But he had been working there for six years. He held a top-secret security clearance. He had no other criminal history whatsoever. And the only reason he was stopped this time is that he was pulled by random screening. So it was probable that he would have been able to bring his impedimenta to his cubicle undetected. He may have been a, well, I take that back, Your Honor. I don't know that he would have been able to bring the firearm. I think they still. How would they have come to search him for the firearm? Well, they wouldn't. That only arose after he was pulled and subjected to the random search. My understanding is, Your Honor, from the facts of the case, that everyone still has to go through metal detection. This random search is additional searching that requires pat-down in addition to the metal detection. So I don't think that you just walk onto that facility without having to go through some metal detection. There was some indication that Mann had some specific reasons for believing that Wynke knew about that meeting, even if they weren't described in the affidavit. And then there was a request for Frank's hearing that was denied. I don't think there was any showing from the government that anything more than what was in the affidavit was presented to the magistrate. I don't believe the magistrate took testimony from Special Agent Mann. It certainly wasn't. Did you appeal from the denial of the Frank's hearing? We did not. And this is, I think perhaps looking back that this was perhaps an error on my part. We did not specifically address the denial of the Frank's hearing in our brief. And I think part of that had to do in terms of the thought process. We were, and I think the argument indicates we were sort of in a position where we have to make a preliminary showing to the court before we even get to a Frank's hearing. And because our position was, and we still believe that the warrant was so bare bones as the court, Your Honor, described it, that it's difficult to show a negative. How do I show that Officer, Special Agent Mann, couldn't know that Mr. Wynke knew? Well, with respect to the happenstance of this having the revolver, Wynke was allowed to enter the building with the rest of his equipment after the search and after the security officer confiscated the knife and the pepper spray. It wasn't until later in the morning that Mann interviewed Wynke and asked if he had a gun. So Wynke had gotten to his cubicle or gotten past the initial screen with the gun. With the gun, but not the other items. And I think that's important because that goes to the court's question about Lee on good faith. The officer was incorrect in saying that he made it all the way up to where the secretary was meeting with the handcuffs, with the two-way radios. But he had the gun. I'm not understanding the value of where you're parsing this. He still had the communications devices, the infrared camera. He did not, Your Honor. Oh, I'm sorry. I thought it was they confiscated just the knife and the pepper spray. And the handcuffs, which is not in Special Agent Mann's affidavit. Okay. Then the next step is you go into the facility. It's the campus. The whole thing is a skiff. Mr. Wynke's specific building is also a skiff in and of itself. So that backpack that he had that still had all the other stuff in it, including his iPad and a computer, none of that went with him into the building. It was in a locker at the entrance to the building. And then he goes up to his cubicle workstation where supposedly these other people were meeting. So he had no handcuffs. He had no communication. He had no infrared camera. What did he have on him? He had the gun. And apparently he had one. Nothing else but a gun? He had one handcuff key. There were two handcuff keys. One set of handcuffs, but two keys. It's not clear if both keys worked for the same set. One key was confiscated. It was on his key ring. It was confiscated with the handcuffs. The other key was apparently in, and this, again, part of the reckless statement. And it's not a huge deal, but it is part of it. The officer said it was secreted away in a pocket as if it was in some kind of, you know, special seam or something in the man's pants. And that's not the case. It was simply in his pocket. But there were no handcuffs for the key to operate because those were seats. Let me ask you one question regarding the 100 mile. Yes, sir. He lived in West Virginia, 100 miles from the DHS headquarters in Washington, D.C. Yes, sir. And he traveled via public transportation. What type of transportation? It's the MARC train, Your Honor, has the final stop in Martinsburg. It's a commuter train, sort of like the VRE that goes from Fredericksburg to. So let me ask you this. I suppose working 100 miles away, if you lived in, let's say, Lynchburg, that's probably kind of unusual, I would think, to drive back and forth 100 miles. But Washington, D.C., isn't that pretty common? I mean, for folks to live 50, 60, 100 miles away? It is common, Your Honor. I mean, I wouldn't say it was. My point, and I don't mean to cut you off, but I'm trying to because I know your time is up. Yes, sir. My point, I want to see how you deal with this, is if that's the usual distance for going to your home, what's the difference between living downtown and living 100 miles away? If that's what people do in this area. I mean, if we were in Lynchburg, we got a different analysis to go 100 miles away as opposed to being here. One of the differences is that I noticed in the case that doesn't come to my mind right off, but the district court, when conducting a hearing and evaluating, which didn't happen in this case, the officer's training and experience and what goes on, part of the deference that is provided to some extent to the district court is what that district court knows about the local area and, you know, what the activities are and what this type of officer with this type of training might have. And so here we have a district judge sitting in Martinsburg and a magistrate judge sitting in Martinsburg who is presented with a bare bones affidavit from a special agent who only relies on his training and experience. The magistrate doesn't get any additional information from that. His training and experience based on a facility 100 miles away, not in the community, in Washington, in downtown Washington, D.C. Part of our issue was and the suggestion that given the bare bones nature of the affidavit, that this could have potentially been a rubber stamp issue on the part of the magistrate judge was that when you are presented with an affidavit and we start talking about things like assassination and kidnapping of cabinet level employees, that's not something that we see very often in Martinsburg, West Virginia, even though many of our citizens commute into D.C. And so without more from the officer through testimony, through exactly what his training and experience was, through affidavits from statements from witnesses or what have you, this is a potential that we have for a judge to rubber stamp and issue a warrant in order to, just to prevent what you would refer to, Your Honor, as the potential horrible that could come. Thank you very much. We will come down and greet counsel. We will adjourn court for the day and the panel will resume its seats. And we would be happy to entertain questions from the audience.
judges: Allyson K. Duncan, G. Steven Agee, James A Wynn, Jr.